Before we begin, I think we'd like to hear from both counsel about the issue that we raised in the order, and that is whether there's a final judgment in the light of the counterclaims. Mr. Fleming, do you agree that there's no final judgment in either of these cases? I believe there is a final judgment, Judge Dyke, and I'm happy to explain our position on that. Okay, go ahead. Don't start the clock yet. We'll do this one. Good morning, and may it please the Court, Mark Fleming together with Greg Lantier on behalf of PNC Bank. There is a final appealable judgment here on both parties' claims regarding, in this case, the 136 patent, in the other case, regarding the other two patents that weren't tried. The judgment is a dismissal without prejudice, and let me say three things as to why. First, USAA chose to drop its infringement claim regarding the 136 before trial. No, that's true. And then it went to trial. Neither party put in any evidence on it. There was no verdict on it. Second of all, after the trial, USAA filed a motion seeking to have a second trial on the 136 patent, which it hadn't tried. The district court denied that, saying it was no longer in the case. Neither party said at that time that PNC's counterclaim was somehow still alive. And then after that, the third thing, there was a telephonic status conference. This isn't in the appendix. It happened on January 18, 2023, to discuss what was left to be decided in the case. And during the course of that, Chief Judge Gilstrap stated his intention as to what to do with matters that could have been tried to the jury but were not. And I'll read from the transcript on page 8 of that teleconference. This is the district court saying, To the extent we're talking about counterclaims and defenses and things that could have been part of the jury trial and have been dropped as part of either side or both sides narrowing of the case on the eve of trial or as we approach trial. My practice has, I think, pretty uniformly been that the court encourages that, to narrow cases, to get down to the real issues so that the trial is more streamlined. But that narrowing is without prejudice on both sides of the docket. If the plaintiffs got something they drop that could have gone to the jury or been a part of the jury trial, it's without prejudice. If defendants have things they could have raised that they didn't, that they jettisoned in light of the upcoming trial, then those are without prejudice, too. It's the same treatment for each side of the docket. That's it? Well, that's that part of it. And then at the end of the status conference, he says on page 12, if there's a dispute between you about items that were jettisoned or dropped in advance of trial that could have been a part of the trial, in this case before the jury, the court's position is those are dropped or jettisoned without prejudice. I'm happy to clarify that if you need me to clarify on the docket or in the record, but there's no need to make an issue out of that. I'm going to be consistent with what I've done for years in that regard, and that's the position the court's going to be at. So I think both parties believed that the counterclaim on the 136, just like the affirmative claim on the 136, had been dismissed without prejudice. That's how everyone proceeded. Now, if the court doesn't think that's enough, and the court thinks the judgment in both of these cases somehow need to be reworded, we don't think it's necessary. But if the court does, then what we propose is that the court grant leave to file a motion under Rule 60A, and we can ask the district court to make changes to the judgments. We don't think that's necessary, but we're prepared to do that if this works. Mr. Fleming, I've got to say that I think you were obligated to tell the court about this in terms of the jurisdiction, rather than putting us in a position of having to figure it out and hearing argument about it. Let's hear from Mr. Jay as to what their position is on the jurisdictional issue. Good morning, Your Honors. Our position is the same. There is a final judgment, because neither our claim nor the counterclaim on the 136 patent remains to be adjudicated in the district court in this case. Because of what he just read us, do you construe that as an oral order dismissing all these claims and counterclaims? I think that the claims were dismissed when we dropped them. But my answer is yes. What about the counterclaims? My answer is yes, as to the counterclaim. I think that the district court entered judgment in this case, and there's nothing about the 136 patent in the judgment. I think that that's not an accident. I think that's conscious. It's really hard for us to have to dig through the record and find an oral order that isn't even very clear from what you've read to me that he was dismissing all of the unadjudicated claims. I mean, I understand from what he said there, but it certainly didn't show up in any of the actual documents. And, you know, I'm not going to read and my clerks aren't going to read every single transcript of every single status conference and the like to determine whether these unadjudicated claims that were apparent on the record were somehow dismissed without an official document. I understand that, Your Honor. And I do think that it's better practice to do what the district court did. But you're both at fault, particularly since there's a dispute between you as to whether these cases, these other patents are before us as part of this appeal. I think that we've both agreed with each other that the counterclaim was not live in this case. And I think if there had been any dispute about that, we certainly would have raised it as a jurisdictional issue the moment the notice of appeal was filed. Is that oral order? Which case was that in? In both cases or just the one case or what? The one with the lower docket number that you're hearing argument in now. So what about the other case? So in that case, I think it's much simpler. The district court in the judgment has a line saying what we asked him to or what PNC had asked him to put in this case. All other requests for relief now pending and requested by either party but not specifically addressed herein are denied. So that, I think, is more than sufficient to do what the district court is supposed to do. It's not required to document each individual claim. I understand that the point that Judge Dyke and Judge Hughes have both raised that it would be easier when the question is raised to trace it back. But I think the court's intention is unambiguous. And I think as I read this court's cases, on finality, the question is, did the district court intend to enter a final judgment? What matters is whether the district court has clearly declared his intention. And I think that the materials that we've given you indicate that he has. Okay. So the next question is, are those patents, the 136, the 559, and the 779, are they before us on appeal here? So I'm going to answer no, they're not before you on appeal because they've been withdrawn from the case. In other words, the only thing that could be appealed would be someone arguing that the district court erred by allowing them to leave the case. So basically you're saying that by the specific order in the second case and by the oral transcript in the first case, those claims were, counterclaims were withdrawn from the case? I think that they had been withdrawn without the court needing to say so. But I think that it is documented and there's no doubt in light of both of those things. There's more history about other counterclaims in the second case, which I'm happy to talk about as additional context for why it's very clear that counterclaim four, which is the only claim the court has asked us about, there was no counterclaim on the 779 patent. Never. So the only counterclaim that was in the second case that was raised by the court's order was one about the 559 patent. And as to that, after the trial, there were counterclaims five through eight were other claims that PNC brought for infringement of its own patents. And there was extensive discussion in that case about what remained to be done with these other counterclaims. I think if counterclaim four had been live, it certainly would have been discussed at the time that counterclaims five through eight were being discussed extensively. Would it be tried in that case? Would they be severed? Which is what the district court ultimately decided to do. So I think that's further confirmation. The problem is this, that these other claims were the subject of summary judgment motions on 101 in validity. Are those summary judgment orders before us as part of the appeals in these two cases? They're not, because they are the claim and the counterclaim. So the infringement arguments and the defenses slash counterclaim on any of those patents were all withdrawn from the case at the same time. So I think you can — in other words, the district court did not — So the two of you differ on whether the judge issued a judgment with respect to those claims or treated them as withdrawn. I think that we differ to some degree. I think that we both agree that the ruling is not embodied in the judgment. Our friends on the other side have argued that they were dismissed without prejudice, and what this Court could decide is that they should have been resolved with prejudice. It doesn't make a big difference whether they were withdrawn or whether they were dismissed without prejudice over their objection. Our position is that the claims and the counterclaim, and whether you package the defenses with the claim or with the counterclaim, that they're all withdrawn from the case, they're not embodied in the judgment, and the parties are free to, as the district court said in the first action, to file a new action on that. Go ahead. I'm a little confused because I understand there was a summary judgment, and then you withdrew some of the claims from the case, but there was still a summary judgment of eligibility on those claims. Do you think that somehow they conceded that those claims, their counterclaims of ineligibility, were no longer part of the case just because you withdrew them from your infringement case? Yes. That is our position, right? Because the only... I mean, if they, the record is not particularly clear, but if they objected, wouldn't those claims still be part of the case? Even if you withdrew your infringement case on them, the summary judgment would merge with the final judgment. Yes, that's right. So if they'd said, we want to go to judgment on our counterclaim on the 779 patent, again, that's the only counterclaim that we're talking about in the second case, or on the 136 patent in the first case. Those counterclaims had not been finally adjudicated either. In other words, it's not as if the summary judgment on 101 was the end of the ballgame for the counterclaim. So in other words, if what they wanted was to go to judgment and get a declaratory judgment and have it be granted or refused, then they would have needed to say so. Now, instead, when we withdrew the claim, I think as Mr. Flemings told you, they did not regard there being anything left to do on the counterclaims. And that includes... But the counterclaims weren't limited to 101, right? Correct. That's right. So had the 559 patent stayed in the, what I'm going to call the second case, meaning the second appeal to be argued today, had that happened, then there would have been litigation about it. There would have been testimony in... Whether or not there's a foreclosure with regard to the 101 doesn't answer the question about whether or not the 102, 103 are alive. Well, they withdrew the 102 and 103 on the eve of trial, even before we'd withdrawn the... So we're really only talking about 112. Withdrew the counterclaims? They withdrew their defenses, I think, both as defenses and as counterclaims. Is that in the records on point? It is. Sorry. Doc, it's 624. 624? 624 of the... What is that? That is the notice that PNC filed withdrawing its 102 and 103 arguments before... What did it say? I don't have that with me because it's not in the appendix. But it was akin to the other notices of narrowing that you'll find in the record, saying that... Doc, is entry 624? 624 in the case that corresponds to Appeal 1778 in this Court. What about the other case? So in that case, the... You're relying on the oral discussion, the transfer? Well, no. Also, the district court's decision on the Rule 59 motion, in which he expressly said that the dropped patent had been dismissed without prejudice. It was no longer live in this case, and USA could file a new action on it. In other words, if PNC wanted to pursue a declaratory judgment or an adverse ruling that said part of your argument has been rejected on the merits and have it embodied in the judgment, then they could have asked for that. But I think we all understood that the parties were withdraw... Once the judge denied the Rule 59 motion, that patent was out of the case along with the defenses and counterclaims. This is not the way to litigate. I mean, this is not good. You're supposed to be clear about it. You're supposed to help the district court be clear about it, and you're supposed to help district court be clear about it so we can be clear about it. You shouldn't have to waste time fooling around with this. Let's hear from Mr. Fleming about whether he views the summary judgment rulings as being before us. Your Honor, the answer is yes. The summary judgment rulings are properly before this Court for two reasons. One, the grant of summary judgment at Alice Step 1 is a legal issue, merges into the final judgment under the Supreme Court's decision in Dupree v. Young. Not if you withdrew the counterclaims. I beg your pardon? Not if you withdrew the counterclaims. I think regardless of the counterclaims and regardless of the infringement claim, what we had is a summary judgment deciding that we did not prevail on the issue of Alice Step 1. That meant that when the affirmative claims were withdrawn and when the counterclaim was withdrawn, that amounted to a dismissal without prejudice, I think we're agreed. We are entitled, under this Court's H.R. Technologies case, to appeal the dismissal without prejudice in order to try to get a dismissal with prejudice. If that's what it was, perhaps. But we don't know whether that's what it was. There's a disagreement between you as to whether it was withdrawn or whether it was dismissed without prejudice. I think if there is — if Mr. Jay's position is that there is a final judgment, which I heard him say that there is, then I think the final judgment has to be — No, no, no. His argument is that there's a final judgment on the other claims, not on this one. His view is that you withdrew your counterclaims. So I — Do you have the document for 624? I do not have it in front of me, Your Honor. You have it on the file there. I suspect — In your side file there. I suspect it was either a filing or an e-mail to the Court notifying the Court that we were not going to pursue — And it was withdrawing something. Yeah, that we were not going to pursue this patent because USAA had said it was no longer accusing us of infringing it in the case. And so we were not going to put on any defenses as to it. I suspect that's what it says. I must confess I haven't looked at it because — You wanted to put on a defense, but you still wanted to challenge its validity. We had already attempted to challenge its patent eligibility and loss decisively at summary judgment. Had we won, then there would have been no question of withdrawing or not. We would have been entitled to judgment with prejudice that these claims were not eligible and should never have issued. We lost that. There was nothing further we could have done as to that. Well, but you could have withdrawn your continued reliance on 101. If you had specifically said we're not going to pursue the 101 argument that we lost, we withdraw any defense or counterclaim with regard to 101, then it wouldn't be part of the case, would it? I — I understand your position. I don't know that we — But you could have done. We would have lost it already. We still would have been subject to that summary judgment. The reason we've appealed it — Yeah, yeah, yeah. Look, there's a big difference between the judge saying, I'm dismissing these claims without prejudice, and you're saying, no, we should get them adjudicated so we can appeal them, and saying that we would voluntarily withdraw the counterclaim. Right now, it's pretty confusing as to which happened. What happened is our 101 argument, which would have invalidated these claims and gotten us a dismissal with prejudice, failed. As a matter of — What about your 102 and 103 claims? Well, once USAA no longer — later, once they said we are no longer going to accuse infringement of this patent at trial — Well, it somehow mooted your request. No, it didn't moot. As a matter of narrowing the case for trial, we decided we are not going to burden the court or the jury with prior art invalidity arguments on claims that we are not being accused of infringing. And that was to narrow the case, as Chief Judge Gilstrap said, as something laudable that he encouraged us. That, in essence, constituted withdrawing your previous request for adjudicate — your counterclaim. On 102 and 103. To show that — It didn't change the fact that we had opposed their summary judgment motion on 101. We had lost it. Is there anything — I understand. It seems that you probably wouldn't do that. But is there anything that would have prevented you, even after you got the interlocutory summary judgment ruling against you on the 101 cases, by saying we no longer wish to pursue this and we withdraw the 101 issues from the case? If you had done that — and it's not clear to me you did that — if you had done that, it wouldn't matter about the final judgment or not. It would be out of the case. And you can do that, can't you? If you hadn't done that, I think that it makes sense that the summary judgment ruling merges into the final judgment. But it is very unclear, with all this talk about withdrawing certain defenses and withdrawing certain counterclaims, what you withdrew and what you didn't. I don't know that we could have withdrawn — Of course you can't. No, no. If I may, Judge Hughes, let's assume there was no counterclaim at all. All right? And all that happened was USA accused us of infringing. We said these claims are ineligible under 101. The district court says, summary judgment, you are wrong. That is the same position as having withdrawn whatever counterclaim we had. Assume we never filed it. Right? We never had a counterclaim. We were just responding to their summary judgment motion. They won the summary judgment motion. We didn't have to do anything further. And if they then had said, you know what, we're glad that our claims are — I understand what you're saying. Now, can I stop you just to see if I understand it exactly? What you're saying is the counterclaim of ineligibility didn't matter here, because you have an interlocutory ruling on eligibility that merges into the final judgment no matter what. That is correct. And we are entitled — It is not true that it merges into the final judgment no matter what, because if you withdrew the claim from the case, it's out of there no matter what happened at summary judgment earlier. What matters is they — Right? No, Your Honor, because there's something at issue. You say at the end we withdraw our counterclaim? That still the summary judgment motion survives? How could that be? Because the result of the — USAA. Assume we never had a counterclaim at all. The result of USAA taking out its infringement contention means they are still able to sue us in a later case under the same patent. We are entitled — If you say we're giving up on the counterclaim, the counterclaim's out of there. Correct. No matter what happened earlier. Yes. I'm not relying on the counterclaim for jurisdiction in this Court. I'm — But the problem is — I get what you're saying if the patent was still alive for other reasons in the case, but at least what we're talking about is the two patents that were specifically withdrawn from the case by the plaintiff and whether you agreed to the withdrawal entirely including the 101 argument. If that's the case, if they're withdrawn before the final judgment enters, including any argument — and I don't care whether it's termed a counterclaim or just an argument that it was ineligible. If you withdraw any argument you have with regard to that patent, and that patent is entirely out of the case before the final judgment enters, then what is there left to merge into the final judgment? With regard to that patent, with regard to the other patents, it's clear it merged into the final judgment. If that is the Court's view, then I just want to be clear about one thing, which is if USAA sues us again on these patents, we are not estopped by a summary judgment ruling against us that we have been deprived of the opportunity to appeal. That's all that we're worried about. If it — We didn't withdraw. If it was all withdrawn from the case, if this entire patent was withdrawn from the case, including your arguments against eligibility, are out of the case before final judgment, there is no final judgment and no final decision of the district court that this is eligible. And so I don't see how it could possibly estop you. If that is the Court's view, then — I mean, we can hear from you. I think we're getting into the merits of some of these arguments that we're going to lose, but — We haven't, and that's fine. We can hear it from the other side on this. I just want to be very clear, just because I recognize I'm on the record here and I don't want to be quoted as not having said this. We did not withdraw arguments as to 101. We made the arguments as fulsomely as we could to the district, to the magistrate judge, and to the district court, and we lost. And we're trying to appeal that because we think there was nothing more to do on this patent with respect to 101. There is no reason in any future lawsuit to burden the district court with arguments that's already decided. But if the Court takes a different view and we live to fight another day on this patent, then that's fine. I think you both should be embarrassed that the Court is being put in this position. I rather am. I'm very sorry. I thought our position was clear to the district judge and to each other. We're going to take a brief recess. Yes, Your Honor. What we're going to do here is we're going to require both parties to go back to Judge so that we have an order that's clear to us and that we can address properly on appeal. And that may require you to file another notice of appeal when the time comes, and if so, we'll have that appeal consolidated with this one up here on the same docket. We're going to go forward with the oral argument, but obviously we're not going to render any kind of decision until the status of the judgment gets cleared up. So, Mr. Fleming, go ahead in the first case. Thank you, Your Honor. Good morning again, and may it please the Court. Mark Fleming together with Greg Lanthier on behalf of PNC Bank. These claims do not say we have invented a new technical capability for customer devices. They are directed to, as USAA says on page 49 of its red brief, a new way of depositing checks, and they recite simply using preexisting computer capabilities that USAA did not invent. That's confirmed by the specification, which reads like a high school textbook, describing off-the-shelf technology. It boasts not of any technical improvement, but of depositing checks with electronics that today's consumers actually own, and it states its benefit not as any improvement to a prior art device, but as avoiding having to go to a local bank branch and physically present the check to a bank teller. That's the top of column two of the 638 patent on page 231 of the appendix. Nothing is claimed or even disclosed that suggests that the devices do anything technical that they couldn't do before. So remote deposits, instead of going to the bank, remote deposit was known in New York, right? It certainly was. I mean, I'm old enough to remember depositing checks by mail. Yes, yes, of course. And so the advance over the prior art was, in the view of the patentee, we've got a different way of doing it than using these scanners. A different way? So it's something more like a consumer could have instead of a business. And as the patent articulates it, it means you don't have to go into the bank branch and give it to a teller. So you don't have to go to the bank branch if the scanner, if a business, you know, like if Wal-Mart has a scanner so they can take a check and do it, right? Well, this solution was not directed to Wal-Mart. It's directed to personal. We ask what's the improvement over the prior art, right? The stated improvement over the prior art is not over high volume scanners that businesses were using. It is over the ways that individual retail personal banking was done to deposit checks. This is what it says at the top of column two, the passage that I read. It's all about people, individual customers going to the bank to deposit a check to the teller. And that is what they claim to have improved. And they claim to have done so not by improving any actual device or technical capability, but simply by putting together capabilities that the devices itself could already do. And recall. I ask this because I didn't see the general question is what's the improvement over the art? What's the advance? And I didn't see you clearly saying in your brief it was over the way human beings do this. Instead of going to the bank, you use your phone. No, we certainly cited column two of the 638 patent, which is the statement of the improvement over the prior art. You know, the spec itself does not purport to improve specialized check processing machines. They're specifically excluded in the specification. There's no improvement over that. The improvement here, to the extent there is one, is merely in using preexisting devices to make it easier for individuals to deposit checks. I'll say also on this point, Judge Clevenger, USAA cites no case, and I know of none, that says that claims to a general-purpose computer that perform a financial transaction suddenly become non-abstract just because there were other prior art devices out there that some companies were already using to perform the transaction. I mean, look at Solutran. Solutran had prior art, micker readers, low-volume readers at the point of sale that scanned checks, and the patented invention supposedly replaced them with a high-volume backroom or outsource scanning operation. It was still abstract because all the claims were doing was using general-purpose devices functioning in the way they always have to gather up information and process it. Content extraction, right? The prior art had ATMs that couldn't scan checks. They were replaced with ATMs that could scan checks. It was still ineligible because all the patent he did was not invent an improvement to technology, just rely on conventional data processing techniques. So this notion that the presence of some businesses using check scanners is somehow relevant to the asserted invention in these patents, I think, is a distraction and needn't detain the court very long because the purported invention here is really just to what ordinary people, customers, were doing to deposit checks, and that's all that Column 2 recites that at length. I quoted the beginning of it, but it goes on for a couple of paragraphs about the inconvenience of going into the bank branch, interrupting your work day, going and talking to a teller. Maybe the bank is closed. Maybe it's a long way away. Those are not problems that the businesses were having with their scanners. Those are problems individuals were having. I don't recall off the top of your head which lines in Column 2 of the 638. Sure. 638, and that will be the appendix page. I'll start at the bottom of Column 1. This is page 231 of the appendix. At the bottom of Column 1, line 65. While a check may provide a payor with a convenient and secure form of payment. 231. 231, yes, Your Honor. And line which? Column 1, line 65, down the bottom left. While a check may provide a payor with a convenient and secure form of payment, receiving a check may put certain burdens on the payee, such as the time and effort required to deposit the check. For example, depositing a check typically involves going to a local bank branch and physically presenting the check to a bank teller. In addition to the time commitment that may be required, visiting a bank branch may be problematic for the payee if the bank's hours of operation coincide with the payee's normal hours of employment. Thus, the payee may be required to leave work early and or change work schedules. Carrying on, a check may pose other burdens for the payee. As noted above, a check may not be freely transferable, thereby limiting the payee's ability to use funds from the check. For example, it is usually difficult for the payee to purchase goods and or services using a check issued by the payor. While the check may be endorsed and accepted by a third party, and I can carry on, and then at the end of this paragraph, line 23, therefore, there is a need for a convenient method of remotely depositing a check while enabling the payee to quickly access the funds from the check. That's what these claims are directed to, a convenient method of remotely depositing a check while enabling the payee to quickly access the funds from the check. And that is all done by using existing well-known devices and computer functionalities that USAA does not claim to have invented and certainly not even disclosed or claimed. At step two, let's recall, the abstract idea itself, check deposit, cannot be the inventive concept. The test, as this Court has repeatedly said in cases like BSG v. Five Seasons, and I'm quoting here, is not whether the claimed invention as a whole is unconventional or routine. Rather, the question is, quoting again, whether the claim limitations other than the invention's use of the ineligible concept to which it was directed were well understood, routine, and conventional. Here, but for check deposit, every piece of claimed technology and functionality is conventional and they're used in their ordinary way. So hypothetically, if we have this same problem and USAA decides it can come up with a cheap and convenient special purpose device that it's going to mail to every single customer that requests one. It's some kind of electronic device that you can just push the check through yourself. It'll scan it. It'll communicate with the bank and do all those details. Would that device be patent eligible? It would depend on whether the device was simply putting together well-known computing and networking features. I mean, it's a special purpose device. Like, it's actually, they said, well, we're just going to create, and it may be obvious, clearly, but we're going to create a handheld scanner and we figured out a way to do it cheaply enough to give to every single customer that requests them and we're going to put our own special purpose programming on that device. And if that's what they're claiming, this device that, with this special purpose programming that allows a consumer to deposit a check, is that eligible? So I'm going to say maybe, but let me say why I'm hedging, because I think that's very close to the facts of content extraction, where content extraction said, you know, we have these ATMs, but they can't scan checks. Let's make it so that the ATM can scan checks. It'll be better for the banks. It'll be better for the customers. This Court said that was ineligible because it was just using routine, conventional technology in a specific environment of check deposit. And what Your Honor has described doesn't sound that different from that. Now, it may be. Let's just assume a hypothetical means that they actually, I mean, I'm answering the question by posing this condition on my hypothetical. But it is a special purpose device that doesn't exist. They've come up, like I said, with a convenient, inexpensive way. This clearly would never practically work. We would never do this. But they did. But they did have a physical device that nobody had ever invented. It's not just an adaptation on something. And it actually has specialized computer programming. It seems to me that you may want to quibble or want to hedge your bets, but it seems like that is pretty arguably over the eligibility line. Well, I think, as Your Honor has described it, it could well be. And, in fact, it could be. Here's my question. Yeah. And, again, hypothetically, take away the special purpose device but keep the specialized programming and just use it on a phone. What's the difference there? I think if they had claimed a specific algorithm or a specific way to take an image of a check that would be depositable and they had disclosed what was actually innovative about that, technically innovative, and they had claimed that, then they might well have something patent eligible. But they didn't do that. They just claimed the result. The closest they get, if you take Claim 13 of the 598, it ensures, it says that the image has to have an appropriate orientation or be appropriately sized. There's no technical improvement stated on how to accomplish that. It's not even clear what the result is other than that it be appropriate. Now, they could have claimed more narrowly, but they wrote the claims this way for a reason. They wanted to claim as broadly as they could so they could go after the entire industry, which is what they've done. Had they claimed an algorithm or something specific, a specific program and a way to do this, not just claiming the result, they might well have had something. But that's not what they've done. They've just claimed the result or the goal without reciting a way of achieving it. And if claims like this can get over Step 1, then I think there are a number of this Court's cases that were wrongly decided. I mean, I don't think it's distinguishable from Apple v. Amaranth, for instance, where the patentee said, well, it's hard to program this functionality in this way. There are all kinds of innovative programming details involved. This Court said that was irrelevant because those details aren't in the claims. All the claims are is directed to a certain functionality, not an improvement in the way the computers operate. Here we don't even have it in the spec. There's no explanation in the spec of how exactly to achieve these claims, these supposed technical improvements, other than simply to use these devices in the way that they've always been used. And then with respect to Step 2, this is, first of all, a case I think like Chamberlain or like Freestream Media where the Court can get to Step 2, even though the District Court didn't, because there are no genuine disputes of material fact. And I think in order, I stress material, because no doubt USAA is going to say there are lots of disputes of fact, but the facts are immaterial, and that has to do with the legal flaw in the theory. All of the evidence that USAA has cited to this Court includes the abstract idea of check deposit in its Step 2 analysis. There's no authority for doing that. The authority is the other way. As I said at the beginning, in cases like BSG and in Chamberlain, the relevant inquiry is not whether the claimed invention as a whole, including the abstract idea, is unconventional or routine. I mean, take Alice, right? The question was not whether it was unconventional to use a computer to do intermediated settlement. You take out intermediated settlement and say, what else is there that's new and unconventional that adds to the abstract idea? I'm sorry, Judge Bartlett. As to material facts, your adversary says that there's a material fact here regarding the OCR performing the function of reading the MICR information. So I'm glad Your Honor raised that. There is no – I mean, there may well be an attempted dispute on that. They don't claim to have invented using OCR to read a MICR line. That's shown by the redacted material, which is discussed on page 52 of our brief. I can't discuss it in open court, but if you look at page 6666 of the appendix and page 52 of our blue brief, it explains why USAA did not invent OCR for the MICR line. Their expert, Mr. Krizere, admitted that. Are there not specifically claiming that the OCR reads the MICR? There are some claims that recite that. They don't all. It's true there are some in this case and in the other – sorry. None of the asserted claims in this case recite OCR for the MICR line. There are, I believe, maybe claim 3 of the 598 talks about just one image of OCR and one image of the check. But the only claims that mention – Is that the problem? They just – if they'd cited that other patent in this case, they'd take away one of your arguments? No, they wouldn't, Your Honor, because, you know, even as – because there are some claims that do recite it. The 136 has a couple, and two of the patents in the other case do recite it. But the point is, none of the – the patents nowhere say that there's anything innovative or unconventional about using OCR on the MICR line. If there was something innovative as to that, you'd expect to see it recited. They'd expect – Well, they expect to recognize that OCR is capable of reading MICR. Right. And they don't say – Especially if that wasn't the conventional way. The folks that had these big standards lined up, they'd read the MICR in a different way. But that doesn't mean that a skilled – that a skilled artisan, which is an electrical engineer or someone with years of experience doing software for imaging, didn't know how to do it. If there was something actually technically difficult about using OCR for the MICR line, then they would have – they would have said that in the patent. All the patent says about this – it has one line on this. Page 236, Column 11, Lines 40 to 41, OCR can be useful in determining MICR line information. That's right. There is no suggestion that there was anything technically difficult about it, that OCR – But the fact that it wasn't being done in the conventional arts is irrelevant. Well, the fact that it wasn't being done in the banking industry is irrelevant because bankers are not persons of skill in the art. Persons of skill in the art are, as their expert admits on page 6251, their electrical – our expert said they're electrical engineers. They took no issue with that. They said it could also include people with one or two years of experience imaging – making software for imaging. And let's remember – I mean, our expert put in testimony – I think we're out of time. All right. I'll give you two minutes. Thank you, Your Honor. Mr. Jay? Thank you, Your Honor. The claimed advance is not – So looking at page 31 of your brief, you have this wonderful quote. It says, Ultimately admitted that accomplishing a check deposit on a consumer device,  required the development of extremely non-obvious algorithms, close quote. Those algorithms are not in the claims, right? The algorithms at a software level are not in the claims. That's right. But I think what that quote is getting at is another point admitted by the same expert, which is that when you seek to use consumer technology to do the job that had previously been done by a commercial scanner, new technical challenges are created. And that comes from the pretty simple and intuitive point that – But you didn't overcome them. The claims don't – do not claim overcoming those problems. It doesn't tell you how to do it. It does claim a number of ways of how to do it, Your Honor. So let me walk you through it. So the advance is using consumer technology to achieve check deposit and solving the technical challenges that arise when you try to use a phone camera instead of a copier-sized scanner or a specialized check scanner. So those are new technical challenges. And if you look at the claim language, the way in which the claims go about solving that are, one, allowing the bank to – That's the advance over the art? Yes. Where do we see that in this patent? A couple of places, Your Honor. And one is the most basic point that in Column 4 where you see the – Column 4 of? I'm sorry, of the 638 patent. Right. Right. The – if you're with me, it's lines 17 – 16 and – What page? Oh, I'm sorry, 232. 32? 232. Column 4, okay. Yes. Which lines? So we're starting at line 16, right? The term general purpose computer specifically – Line 16? Yes. The term general purpose computer specifically excludes specialized equipment as may be purchased by a business or other commercial enterprise, for example, for the specialized purpose of high-speed high-volume check deposits. A particular advantage of embodiments of the invention is its ability to operate in conjunction with electronics that today's consumers actually own, such as a general purpose computer or a scanner. Okay, but your problem – Who's that quoting you? Your problem is this, that it's a concept of doing that. It doesn't tell you how to do it. In fact, by your own admission, you can't do it without highly non-obvious algorithms, and those aren't in the claims. But what is in the claim is – and I'll start with the 638 patent, Claim 20, which is inside the front cover of our brief – is the concept that my friend says is the concept in the claims is just depositing a check. What this is directed to is solving the technical issues of obtaining an image with a camera. It doesn't tell you how to do it, does it? Sure it does. So first, the bank sets the criteria that are necessary to deposit the check. That's part of the claim construction of deposit, so that the image has to be suitable for deposit. The bank creates the software and places it on the consumer's device. The bank's software then controls the consumer's device – to generate a compliant image. That wasn't a problem that you had to face when it's the bank teller looking at a paper check, or even a large business running checks through a specialized scanner that don't have the problems of poor lighting or skew, or all the problems that go with a 3D versus 2D image, which is what a cell phone camera is taking. What language in Claim 20 do you think claims this non-obvious algorithm? It has to place the bank's app on the customer's mobile. The bank then causes the customer's mobile to perform the following steps. It instructs the customer to take a photo. It assists the customer as to an orientation. Then, as we skip down to the next-to-last step, the system is configured to check for errors to confirm if the mobile check deposit can go forward. If you look at the construction that goes with deposit, with deposit a check or mobile check deposit at 5102 of the appendix. This doesn't do it for me. Is there anything in the specification that actually further describes what the non-obvious algorithm behind Claim 20 is? There are a number of things in both the specification and the dependent claims of the other patent in this case. As we get deeper into the second case, the claims get more detailed and we get to auto capture in 2009. In this case, the specification explains that the criteria are set by the consortium of banks for a compliant check. I'm not hearing a non-obvious algorithm in your answer. This, to me, is not a means plus function claim that actually points to a specific algorithm which might help you. Even if we don't go down that route, like we did in Infish, I don't hear the words, non-obvious algorithm is disclosed at pattern something in the specification and includes these steps. The steps of these two patents that we're talking about, and I do want to get to the dependent claim that Mr. Fleming referred to as well. The steps are not programming the software in particular ways, but I think that McRow or Infish or any number of cases make clear. I think the other side doesn't disagree. You don't need a software algorithm in the claims. Yeah, but McRow is really dependent on the fact that it actually disclosed very specific detailed steps. Right. All you're telling me is that the banks, the consortium of banks get together and decide all the criteria, but you don't even disclose what those criteria are. Well, I think the specification does talk about the 16 aspects of a compliant image and the claim 13 of the 598 patent, which is on page 206 of the- I thought you said it wasn't possible to do this until 2009, and the patent priority date is 2006. It seems to be claiming something that was invented in the future. No, that's not correct, Your Honor. But the USAA developed this innovation, and there is evidence in the record of when the first deposit using an image was- 2009, right? I don't think that's right, but I don't think that that's material. The question you're asking sounds like a written description, possession argument, and what we're talking about is what was either the claimed innovation over the prior art or- Well, it's not just a written description question. It's a question of whether you invented something that was a real invention or whether it was just an abstract concept that somebody else was going to fill in and invent in the future. That's what 101 is directed to, among other things. So if it were claiming the result, I would understand your question, but these are not claims directed to the result of remote check deposit. They're not even directed just to the result of achieving remote check deposit with a consumer device, even though that had never been done before. Other banks have been chasing this innovation and had not made it work. USAA made it work with a consumer device because using a self- How did they make it work? They make it work because the bank sets the criteria in its software, puts its software on the customer's device, and then controls the customer's device and tells the customer what to do. It works because something that's not claimed is used. I'm sorry? Everything has a sense when it claims, right? It works because something that's not claimed is used to accomplish it. Well, but the criteria that the invention is used with, these are, for example, let's look at claim 13 of the 598 patent, right, to confirm that the image is legible. You're going to have to tell us which page. Page 206, sorry. We were on the 638. Of course, I'm sorry. So Mr. Fleming read part of this, but not all of it, and this is to confirm that the- 206, which claim are you talking about? 13. We're analyzing at least one electronic image to confirm that the image is legible, is appropriately sized, has an appropriate orientation, has an appropriate format, includes a validating image feature, includes a properly located image feature, or a combination thereof before triggering the deposit. So how does it analyze it? Isn't that the problem? You have, this is what it looks at, but you need to show that you invented how it does it beyond just saying analyze it. So what we've invented is a system that can allow a bank to do this without having to take, you know, sort of a bunch of photos taken and uploaded by the customer and being overloaded with noncompliant images. It ensures that the customer takes an image that complies with the bank's criteria. Claiming exactly what the lighting criterion is from, you know, from day to day to make a technically compliant image, I don't think respectfully, Your Honor, that this Court's 101 cases require us to claim exactly what subroutines necessary to specify what lighting criterion is good enough. The point is that the human eye can't judge from an image whether it's going to be technically sufficient for the processing by the bank. Processing a photograph had never been, a photograph had never been OCR'd to take the micro data and deposit it. Scanners had been used. Of course, the micro line originally had magnetic ink. That's what the MI stands for, right? And so taking a device that can be held at a distance from the check and a quick digital image snap raises all kinds of different technical challenges, which is exactly what the other side's expert agreed to, that the technical considerations in taking a 3-D image from a distance under ambient lighting without specialized knowledge, that's the challenge that we're solving. We have a first step problem in deciding whether we agree with you on what the claims are drawn to, whether it's to improving over the human being going in the bank to make the deposit or improving over scanners, right? That's basically right. If we agree with him, you're out, right? We're not claiming that it would be non-abstract to, we're not claiming that the check deposit is a non-abstract idea. It's a question of what are the claims drawn to. Right. We obviously don't agree with the idea that it's drawn to check deposit. Even if you thought it were drawn to check deposit, I think we have our step two argument. Right. We have our step two argument about the fact that this had not been accomplished, that this was truly innovative in the industry. The admission of the other side's expert that he had never looked at the ordered combination, just as the other side's brief tries to do in this case, trying to slice individual elements and saying this is abstract, this is abstract. OCR is not patentable. Comparisons are not patentable. Didn't look at the ordered combination. Here the ordered combination involves having the bank set these criteria, having the bank control the consumer's device, and having the consumer's device take a compliant image by following instructions provided by the bank along the lines that we've just been discussed that meet the claim limitation of ensuring that the image will be sufficient for deposit. No further questions about 101, although I'm certainly happy to answer them. We do have a cross appeal in this case, which I'll just say a word about. That word is this, that the other side's citation counting methodology, I think the expert basically acknowledged that you can't value, you can't determine the value of a single patent just by the sheer number of citations that have been put into other patents. And in this case, the question in a hypothetical negotiation is, what would the value have been to a financial institution trying to license USA's technology? I think the expert basically acknowledged that he had to come up with some limitation to try to make it germane. He tried, but he didn't succeed. The five subject areas that he limited to aren't even germane to financial services. They include things like media. And I think that really in one sentence is the gist of our challenge to his methodology, and we submit that that would be a basis to reverse the damages award. Unless the Court has any further questions. Thank you. We'll give you a minute for rebuttal on the cross appeal. Mr. Fleming, you have two minutes. Thank you. May I proceed, Your Honor? Yes. Judge Clevenger, I'd like to complete my answer to your question on OCR for the Micker line. On page 5607 and 08, our expert, Mr. Peterson, points out, and this is not disputed, by 1999 the Standards Institute required Micker lines to be OCR readable. He says this on 5578 as well. He also says on 5618 and 5620 that in the early 90s and early 2000s, sorry, in the 1990s and the early 2000s, fraud detection software was using OCR to read Micker line routing number and signatures and to identify duplicates. The only evidence on the other side is the assertion that OCR in the Micker line was not being used in commercial products. I don't think that's true. But even if it were true, that does not limit the knowledge of a skilled artisan. A skilled artisan, page 6251, is electrical engineers or people with experience developing software for imaging. They would know to use OCR for the Micker line, even if banks Do you happen to know what kind of technology was being used to read the MICR? Well, again It wasn't OCR. It was OCR in fraud detection software, as our expert says on 5618 and 5620. It was also being read using magnetic ink recognition, you know, in commercial scanners. The other side says it's not being used. It means something else is being used because you have to read the line. Magnetic ink character recognition was being used before that. I mean, MICKR has been around for a very long time, as has OCR, and it was being used for the MICKR line starting in the 90s and then again in the 2000s. I didn't hear Mr. J identify any actual Oh, and by the way, just to finish that, I'm sorry, I meant to say this. If OCR for the MICKR line were really all that technically difficult or innovative, then they would have disclosed that and explained how they did it in the specification of their patents. They don't. I read, Your Honor, the line, the only line that talks about OCR for the MICKR line that says it can be useful because it didn't need to be explained. Skilled artisans knew how to use it. The claim construction You're out of time. Thank you, Your Honor. Mr. J, there was no argument on the cross appeal, so you don't get rebuttal.